IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Al-Mahdi Mohammed, | : | Case No. 1:02-CV-853 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| Penske Logistics, | : | DENYING IN PART MOTION FOR |
| | : | SUMMARY JUDGMENT |
| Defendant. | : | |
| | : | |

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Doc. #39.) Defendant Penske Logistics ("Penske") contends that there are no material facts in dispute and that it is entitled to judgment as a matter of law on Plaintiff's employment discrimination claims. For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Penske's motion.

I.  FACTUAL BACKGROUND

Plaintiff Al-Mahdi Mohammed is an African-American male and former employee of Penske. (Am. Cmplt. ¶ 5; Ans. ¶ 5.) Prior to his employment with Penske, Mohammed had worked as an over-the-road truck driver for a logistics company called Transpersonnel from 1989 to 1999. (Mohammed Dep. at 32-33.) Transpersonnel had a shipping contract with GE Aircraft Engines ("GE") during the time of Mohammed's employment. (Id. at 33.) In January 2000, Transpersonnel lost the GE contract to Penske. (Id.) Penske offered positions to all former Transpersonnel drivers when it took over the contract, but Mohammed declined to accept employment at that time. (Id. at 33-34.)

Mohammed asserts that he first applied for employment with Penske in April 2000, and then filed an updated application on February 9, 2001. (Id. 37-38, 41.) Penske's records do not contain an application prior to the one completed on February 9, 2001. (Peters Aff. ¶ 8.) On February 16, 2001, Mohammed filed a charge of racial discrimination jointly with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission (jointly referred to herein as the "OCRC charge"). (Am. Cmplt. ¶ 7; Ans. ¶ 7.) The parties negotiated a settlement of the charge through the OCRC. (Mohammed Dep. at 83.) A brief discussion of the organization of Penske is necessary to understand the terms of the settlement. Penske employs both local drivers represented by Teamsters Local Union No. 100 and over-the-road, or longer-haul, drivers represented by Teamsters' Local Union No. 114. (Peters Aff. ¶ 4-5.) The drivers on the Local or City Board, and the Road Board, as the two groups of drivers are respectively known, have separate collective bargaining agreements ("CBAs"), pay, and seniority rights. (Id. ¶ 4.)

As part of the settlement, Penske hired Mohammed onto the Local Board with the understanding that he would be placed on the Road Board when a position came open. (Id. ¶ 10; Mohammed Dep. at 78-79.) It is undisputed that Mohammed, pursuant to the settlement, signed a standard OCRC form called a "Request for Withdrawal of Charge of Discrimination" ("the first withdrawal") on June 5, 2001. (Kautzmann Aff. ex. A; Mohammed Dep. at 83-84.) The undisputed first withdrawal is the only Request for Withdrawal found in the official OCRC file. (Kautzmann Aff. ¶ 3.) It contains no facts specific to Mohammed's dispute, but merely states that Mohammed "request[s] the withdrawal of [the] charges because the issues of my charge have been resolved." (Id. ex. A.)

Other crucial facts regarding settlement of the OCRC charge are disputed.  Mohammed testified at his deposition that, during the negotiations leading to the settlement, he requested that Penske give him full seniority rights as if he had been hired in April 2000, the date he contends he first applied for employment.  (Id. at 78-80, 84.)  He admitted that the OCRC representative told him that the OCRC did not have the authority to impose that requirement on Penske and that he would have to file a court case to have the seniority provision imposed on Penske.  (Id. at 82.) Mohammed also testified that it was discussed that the union would have to be involved in any issues regarding seniority.  (Id. at 82, 176.)  Pursuant to the CBAs, Penske determined seniority based on the date an employee was hired into a position within the union. (Peters Aff. ¶ 10, 12.) However, Mohammed also testified at his deposition that he and Penske had agreed that he would join "the local board with the intention of going to the road board with my seniority." (Mohammed Dep. at 174.)  Mohammed clarified again in later testimony that he intended seniority to mean the April 2000 date.  (Id. at 222-23.)

In a subsequent affidavit, Mohammed again asserted that obtaining seniority based on the April 2000 application date was a prerequisite to his agreeing to settle and withdraw the OCRC charge. (Mohammed 2/10/06 Aff. ¶ 7.)  Mohammed asserted that he signed the undisputed withdrawal on June 5, 2001 without realizing that it did not contain the seniority provision. (Mohammed 3/3/06 Aff. ¶ 4.)  He stated that he requested the OCRC investigator to revise the withdrawal form and he presents into evidence a second Request for Withdrawal of Charge of Discrimination ("the second withdrawal") similar to the undisputed withdrawal, but with the addition of a seniority provision.  (Mohammed 3/03/06 Aff. ¶ 4 & ex. 1.)  The signed second withdrawal states that "Penske Logistics and I have agreed that once they place me on the Road-

3

Board in which the position I first applied and with my proper seniority, I will withdrawal [sic] my charge." (Mohammed 3/3/06 Aff. ex. 1.)

Mohammed began work at Penske in late May 2001 on the Local Board with seniority rights effective for that union as of May 29, 2001. (Mohammed Dep. at 85, 87 & ex. 4.) Penske transferred Mohammed to the Road Board in June 2001 and assigned him seniority based on the transfer date. (Peters Aff. ¶ 12; Mohammed Dep. 175-76.) Mohammed testified that a Caucasian driver, Allen Hicks, was hired onto the Road Board in a manner that unfairly gave him greater seniority than Mohammed. (Mohammed Dep. at 216, 219 & ex. 7.)

In February 2002, Penske laid off Mohammed and Hicks, along with other drivers, due to a lack of work. (Id. at 213-14, 219; Peters Aff. ¶ 4.) Both drivers later were offered the opportunity to transfer employment to the Local Board; Mohammed returned to work on the Local Board in or around September 2002 following a medical surgery. (Mohammed Dep. at 213-220; Peters Aff. ¶ 15.) Before his return to work, Mohammed filed a second charge of discrimination with the OCRC on March 19, 2002 ("the second OCRC charge") alleging that he was discharged based on his race and religion and in retaliation for filing the first OCRC charge. (Id. at 215 & ex. 7.) He filed a third OCRC charge on May 6, 2002 alleging that he was denied recall to the Road Board in April 2002 based on his race and religion and in retaliation for filing the previous charges. (Id. ex. 9.) He testified in his deposition that a driver named Dave Smith was recalled despite the fact that Mohammed should have had greater seniority based on the purported April 2000 job application. (Id. at 230-31.) Penske admits that one Caucasian employee was recalled, but states that he had greater seniority rights than Mohammed. (Ans. ¶ 10; Peters Aff. ¶ 14.)

4

Subsequently, Mohammed was disciplined in January 2004 and terminated in February 2004 for his failure to follow protocol in regard to the delivery of two jet engines to a GE facility. (Peters Aff. ¶ 17-19.) An investigation of the incident determined that the engines had not been damaged during the delivery, but Penske concluded that Mohammed could have "likely caused serious property damage." (Id. ¶ 19 & ex. 5.) Mohammed denied that he acted in an improper manner and grieved his termination. (Mohammed Dep. at 236-253, 260; Peters Aff. ¶ 20.) The grievance procedure resulted in Penske returning Mohammed to work on the Local Board with back pay. (Mohammed Dep. at 262-63 & ex. 14; Peters Aff. ¶ 20-21 & ex. 6.) Mohammed and Penske signed a written settlement agreement specifying his back pay award and stating that "Al-Mahdi Mohammed agrees that this will release the company from any further claim with regard to his discharge on 2/12/04." (Mohammed Dep. at 266-67 & ex. 14; Peters Aff. ¶ 20-21 & ex. 6.)

Upon his return to work, Penkse informed Mohammed that he would not be permitted to make any deliveries on the GE contract without re-training on proper procedures for securing jet engines. (Peters Aff. ¶ 21.) Mohammed objected to the training on the grounds that re-training was not part of the grievance settlement agreement. (Mohammed Dep. at 262-63, 267-68.) Mohammed asserts that he nevertheless requested to take the re-training, but that he was not told when it would be offered and was not permitted to take it. (Id. at 267; Mohammed 2/10/06 Aff. ¶ 11.)

Mohammed also alleges that after he returned to work that he was limited to eight-hour shifts, denied overtime, and prohibited from bidding on certain work. (Mohammed Dep. at 263; Mohammed 2/10/06 Aff. ¶ 11.) He asserts that the net result of Penske's actions was to reduce

5

his pay by 20% as compared to before the GE Aircraft Engines incident. (Mohammed 2/10/06 Aff. ¶ 12.) Penske, for its part, points to the fact that Mohammed had a significant number of absences from work following his return from suspension on March 8, 2004. (Peters Aff. ¶ 21.) Penske's records indicate that Mohammed worked only eight days between March 8, 2004 and April 12, 2004, the date he began taking Family and Medical Leave Act leave following a hernia surgery. (Peters Aff. ¶ 21-22.) Additionally, Mohammed had accepted employment with another shipping company after the GE incident suspension and he maintained that employment at least part-time following his reinstatement at Penske. (Mohammed Dep. at 281-83.) Penske learned that Mohammed was working for the other company during his period of FMLA leave. (Peters Aff. ¶ 23.) There is some factual dispute in the record whether, upon learning about Mohammed's other employment, Penske suspended Mohammed, terminated Mohammed, or only intended to take action against Mohammed. (Mohammed Dep. at 297, 299-300; Peters Aff. ¶ 24.) Regardless, Mohammed resigned from Penske on or about June 9, 2004. (Mohammed Dep. at 297-98; Mohammed 2/10/06 Aff. ex. C.)

Mohammed filed a Complaint (doc. #1) against Penske in November 2002 after he was not recalled to the Road Board, and he filed an Amended Complaint (doc. #19) in August 2004 after he resigned from Penske. In the Amended Complaint, he alleges racial discrimination and retaliation in violation of Title VII. Penske filed an Answer (doc. #20) denying the discrimination and retaliation allegations and now has moved for summary judgment. After Mohammed's resignation and during discovery in this case, Penske uncovered evidence that Mohammed had a criminal record when he applied for a position at Penske. Mohammed had stated on his job application that he had not been convicted of a crime. (Mohammed Dep. at 150

6

& ex. 1.)

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Mohammed's claims pursuant to 28 U.S.C. § 1331. Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issue of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III. ANALYSIS

### A. First Cause of Action

Mohammed alleges in the first cause of action that Penske violated Title VII by laying him off in February 2002 and not recalling him, despite the fact that he should have had greater seniority than employees who were recalled. Mohammed alleges the adverse actions were taken on the basis of his race and in retaliation for his having filed the first OCRC charge. Title VII prohibits employment discrimination based on, inter alia, race. See 42 U.S.C. § 2000e-2(a)(1). The anti-retaliation provision of Title VII further prohibits employers from discriminating against an employee who has opposed an action made unlawful by Title VII, including by filing a charge of discrimination as permitted by Title VII. See 42 U.S.C. §2000e-3(a).[1]

In its motion, Penske characterizes Mohammed's first claim as being based on the denial of proper seniority. Penske contends that Mohammed cannot establish a prima facie case of discrimination or retaliation in regards to the assignment of his seniority, that Mohammed cannot show that similarly situated persons were treated differently because Penske assigned seniority in

---

[1] To establish a claim under Title VII's opposition clause, a plaintiff must show that:

(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse [ ] action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse [ ] action or harassment.

Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted). The causal connection factor can be established by evidence that the employer treated similarly-situated employees differently, or in appropriate circumstances, with evidence of temporal proximity between the protected action and the adverse action. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). The Sixth Circuit recently clarified that temporal proximity alone, absent other indicia of retaliatory conduct, is not sufficient to establish the causal connection. See Randolph v. Ohio Dep't of Youth Servs., 453 F.3d.724, 737 (6th Cir. 2006).

8

all cases pursuant to the terms of the CBAs, and that Mohammed cannot refute Penske's legitimate non-discriminatory explanation that it assigned seniority based on the CBAs. Additionally, Penske alleges that Mohammed's seniority claims are barred by settlement, accord and satisfaction, and waiver on the basis of the undisputed first withdrawal.

Each of Penske's arguments are predicated upon a finding that the undisputed first withdrawal of the OCRC is the only valid or authentic withdrawal. The undisputed withdrawal does not contain any language regarding Mohammed's seniority rights. (Kautzmann Aff. ex. A.) Penske, therefore, assigned Mohammed seniority, pursuant to the CBAs, based on the dates he joined the Local Board in May 2001 and then joined the Road Board in June 2001. (Peters Aff. ¶ 10, 12.) In rebuttal, Mohammed puts forward as evidence the second withdrawal which states that he was to be given "proper seniority," which he has testified meant seniority based on his April 2000 application date. (Mohammed Dep. at 222-23; Mohammed 3/3/06 Aff. ¶ 4 & ex. 1.)

The Court finds that there are genuine issues of material fact in dispute regarding the second withdrawal and, hence, the proper date to reference for determining Mohammed's seniority. Penske does not move to strike the second withdrawal, but it questions the authenticity of the document. Penske focuses on the fact that the undisputed first withdrawal, the one without the seniority provision, is the only one included in the OCRC file produced by the OCRC during discovery in this case. (Kautzmann Aff. ¶ 3 & ex. A.) Penske also notes that the other OCRC forms, including at least one of which has an explicit benefit code for "seniority," are not marked in a way that suggests that Penske agreed to provide retroactive seniority. (McCreary Dep. at 22-24 & ex. 3, 4.) Finally, Penske points to portions of Mohammed's deposition during which he acknowledged that the OCRC could not impose a

9

seniority requirement on Penske and that the union had to be involved in issues involving seniority. (Mohammed Dep. at 82, 176.) Penkse asserts that Mohammed cannot now contradict his sworn deposition testimony with affidavit testimony that Penske agreed to provide retroactive seniority. "A party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." Penny v. United Parcel Service, 128 F.3d 408, 415 (6th Cir.1997).

On the other hand, the putative second OCRC withdrawal with the seniority provision has a format similar to the first withdrawal and appears to contain the same signatures. (Compare Kautmann Aff. ex A with Mohammed 3/3/06 Aff. ex. 1.) He contends that he signed the first withdrawal without noticing that it did not include a seniority provision and that he then asked the OCRC representative to draw up a revised second withdrawal form with the seniority provision. (Mohammed 3/03/06 aff. ¶ 4 ex. 1.) Additionally, the Court does not find as a matter of law that Mohammed's later affidavit testimony expressly contradicted his earlier deposition testimony. Mohammed offered somewhat confusing testimony at his deposition concerning what he understood the terms of his settlement to be, but he testified more than once that the parties agreed he would join the Local Board with the intention of transferring to the Road Board with seniority. (Mohammed Dep. at 174, 222-23.) In sum, there are material disputed issues regarding the authenticity of the second withdrawal and whether Mohammed was accorded his proper seniority. The Court therefore **DENIES** summary judgment to Penske as to the first cause of action.

**B.     Second Cause of Action**

In his second cause of action, Mohammed alleges that GE terminated him in February

2004 following the GE incident in wrongful retaliation for his filing the first EEOC charge of discrimination. (Am. Cmplt. ¶ 13-16.) Penske makes several arguments to support its motion as to this cause of action, most of which arise from Mohammed's alleged failure to properly secure the GE engines. However, the facts underlying the GE incident are irrelevant to the Court's resolution of Penske's motion as to this cause of action. Instead, the Court agrees with Penske that Mohammed waived any claims arising from the GE incident during the grievance process with Penske and the union.

The Sixth Circuit recognizes that "under particular circumstances employers and employees may negotiate a valid release of . . . Title VII claims." Adams v. Phillip Morris, Inc., 67 F.3d 580, 583 (6th Cir. 1995); see also Parker v. Key Plastics, Inc., 68 F. Supp. 2d 818, 825 (E.D. Mich. 1999). Federal courts use ordinary contract principles to determine whether a wavier or release is valid, "remaining alert to ensure that employers do not defeat the policies of the ADEA and Title VII by taking advantage of their superior bargaining position or by overreaching." Adams, 67 F.3d at 583. Courts evaluate whether a release has been knowingly and voluntarily executed by examining:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

Id.

In this case, Mohammed filed a grievance pursuant to collective bargaining procedures after he was terminated. (Mohammed Dep. at 260-62.) Pursuant to the grievance settlement, Mohammed accepted reinstatement with back pay and fringe benefits from Penske in exchange

11

for "releas[ing] the company from any further claim with regard to his discharge on 2/12/04."[2] (Mohammed Dep. at 266-67 & ex. 14.) Mohammed testified that he had been represented by the union at the grievance hearing at which the settlement release was signed. (Mohammed Dep. at 265.) He further testified that the understood the terms of the settlement release. (Id. at 265-67.)

Applying the Adams factors, the Court finds that Mohammed signed the release knowingly and voluntarily. See 67 F.3d at 583. He simply has not put forward any evidence or argument to support a finding to the contrary. As such, Mohammed's claim for retaliatory discharge based solely on the February 2004 discharge is barred as a matter of law by the settlement release. See id. The Court accordingly **GRANTS** summary judgment to Penske on the second cause of action.

**C.    Third Cause of Action**

Mohammed alleges in his third cause of action that he was constructively discharged from employment with Penske. To state a constructive discharge claim, a plaintiff must establish that his employer (1) "deliberately create[d] intolerable conditions, as perceived by a reasonable person" (2) "with the intention of forcing" him to quit and (3) he actually must quit. See Moore v. KUKA Welding Sys. and Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999). The plaintiff must show more than a Title VII violation to prove constructive discharge. See id. The Court considers the following non-exclusive list of factors, alone or in combination, when

---

[2] The Court notes that Mohammed appears to have suffered a material adverse employment action when he was terminated despite the fact that he accepted reinstatement with back pay as part of the grievance process. A termination and concomitant loss of income can constitute a material adverse action, even where the plaintiff later is reinstated with back pay. See Burlington Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2417 (2006); Randolph, 453 F.3d at 736-37.

examining a construction discharge claim:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001).

Penske moves for judgment on the grounds that Mohammed objectively could not have felt compelled to resign as a result of alleged discriminatory conduct by Penkse. Instead, Penske contends that Mohammed voluntarily resigned after Penske learned that he had been working for another company while employed by Penske. Penske asserts that by this behavior Mohammed violated Department of Transportation ("DOT") regulations and Penske policy. (Peters 2/24/06 Aff. ¶ 7-8; VanSickle Aff. ¶ 2-4.) Penske implies that Mohammed knew that his activities provided Penske with a non-discriminatory basis for terminating his employment.

The Court first notes that Mohammed testified at his deposition that he did not know that DOT regulations required him to report his dual employment to Penske, creating a disputed issue of fact regarding whether he would have felt compelled to resign for that reason. (Mohammed Dep. at 283-88.) Also, Mohammed has suggested that other objective factors led him to feel compelled to resign, including a reduction in job duties and a reduction in salary. He points to Penske's mandate that he receive additional training before he could haul GE engines, a condition imposed after the parties had settled the GE incident grievance, and alleges that he was not permitted to take the re-training. (Mohammed Dep. at 263, 267; Mohammed 2/10/06 Aff. ¶ 11.) He also states that he was denied proper seniority and denied the opportunity to work overtime. (Mohammed Dep. at 263; Mohammed 2/10/03 Aff. ¶ 11.) He estimates that the net

effect of these actions was to cut his pay by 20%. (Mohammed 2/10/06 Aff. ¶ 12.) Though it is a close question, the Court finds after viewing the evidence in a light most favorable to Mohammed that Penske is not entitled to judgment as a matter of law on the evidence submitted at this stage. Accordingly, the Court **DENIES** Penske summary judgment as to the third cause of action.

**D.**     **After-Acquired Evidence Defense**

The facts underlying Penske's defense that Mohammed falsified his employment record do not need to be discussed in detail here. The Court finds that a genuine issue of material fact exists in regards to whether Mohammed intentionally falsified his employment record.

**IV.**     **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment (doc. #39) is **GRANTED IN PART,** as to the second cause of action only, and **DENIED IN PART**, as to the first and third causes of action**.**

IT IS SO ORDERED.

    s/Susan J. Dlott
Susan J. Dlott
United States District Judge